Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Richard A. Posner | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 3646 | **DATE** | 10/29/2003 |
| **CASE TITLE** | Asahi Glass Co. Ltd. vs. Pentech Pharmaceuticals, Inc. et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER OPINION:** Motion to dismiss the complaint is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | OCT 3 0 2003 date docketed | |
| ✓ | Docketing to mail notices. | | | 54 |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| ✓ | Copy to Magistrate Judge Nolan. | 03 OCT 29 PM | | |
| SCT | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| ASAHI GLASS CO., LTD., | ) | **DOCKETED** |
| | ) | |
| *Plaintiff,* | ) | OCT 3 0 2003 |
| | ) | No. 03 C 3646 |
| v. | ) | |
| | ) | **Richard A. Posner,** |
| PENTECH PHARMACEUTICALS, INC., | ) | *Circuit Judge.* |
| PAR PHARMACEUTICAL, INC., SMITH | ) | |
| KLINE BEECHAM CORP., BEECHAM | ) | |
| GROUP PLC, GLAXOSMITHKLINE PLC, | ) | |
| and SMITHKLINE BEECHAM PLC, | ) | |
| | | |
| *Defendants.* | | |

OPINION

The plaintiff, Asahi, brought this patent and antitrust suit against two groups of affiliated entities (collectively "Glaxo" and "Pentech"); it was assigned to me under the authority of 28 U.S.C. § 291(b) because of its close relation to two previous patent infringement suits that had been assigned to and decided by me. *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011 (N.D. Ill. 2003), and *SmithKline Beecham Corp. v. Pentech Pharmaceuticals Inc.*, 261 F. Supp. 2d 1002 (N.D. Ill. 2003). The defendants have moved to dismiss the complaint.

Glaxo owns the patent (U.S. patent 4,721,723—"723" for short) for crystalline paroxetine hydrochloride hemihydrate, a crystal of paroxetine (an organic molecule that has antidepressant properties) that Glaxo manufactures into pills and sells under the trade name Paxil. In 2000 Glaxo sued Pentech, a

manufacturer of generic pharmaceutical drugs that was producing—though not yet selling in the United States because it hadn't obtained the Food and Drug Administration's approval of its Abbreviated New Drug Application—an amorphous (that is, noncrystalline) paroxetine hydrochloride in capsule form. The suit charged that Pentech's product infringed patent 723. The active ingredient—that is, the amorphous paroxetine hydrochloride, as distinct from the finished pill sold to the public, which includes inactive ingredients ("excipients") to bulk it up, improve its solubility, etc.—was made by Asahi and sold to Pentech pursuant to a contract between the two firms that has since expired. Glaxo named Asahi as an additional defendant, charging that it had induced Pentech's infringement of patent 723 in violation of 35 U.S.C. § 271(b).

After extensive discovery, Glaxo and Pentech decided to settle their case and in the *Pentech* decision cited above I granted Glaxo's motion to dismiss the case in its entirety—which is to say against Asahi as well as Pentech. By the settlement (the reasonableness of which I did not attempt to determine, for reasons explained in the *Pentech* opinion), Glaxo licensed Pentech to sell Paxil, though not under the Paxil trade name, in Puerto Rico beginning immediately and in the rest of the United States as soon as any other generic version of paroxetine hydrochloride came on the market, though Pentech would have to leave the U.S. market if the other generic left. The "other generic" to which the license implicitly but unmistakably referred was a version of paroxetine hydrochloride manufactured by Apotex, the defendant in *SmithKline Beecham Corp. v. Apotex Corp., supra*, because everyone knew that Apotex would be the first manufacturer of a generic paroxetine product to obtain FDA approval. *SmithKline Beecham Corp. v. Apotex Corp.* was a patent infringement suit by Glaxo, based on patent 723, and if Glaxo won that suit Apotex would have to leave the market, and Pentech, in all likelihood, with it. I ruled that the patent was valid but not infringed; Glaxo has appealed to the U.S. Court of Appeals for the Federal Circuit, and its appeal is pending.

In September of this year, Apotex began marketing its paroxetine hydrochloride, which is anhydrous, like Pentech's—that is, it does not contain a bound water molecule, which would make it a hydrate—though unlike Pentech's product it is not amorphous. Pursuant to the license, Pentech is now selling its unbranded Paxil in competition with Glaxo and Apotex throughout the United States, without protest by Glaxo. Glaxo does not charge Pentech for the Paxil that Pentech relabels and sells, but it does receive a hefty royalty on Pentech's sales of the drug. The license does not require Pentech to obtain product from Glaxo—the license leaves it free to buy anything it wants from anyone, including bulk material from Asahi—but it has no incentive to buy bulk material from anyone, since it is being supplied with Paxil, the finished product, free of charge and would have to pay Glaxo the same royalty regardless of where it was getting paroxetine. And because Pentech has not obtained the FDA's approval to sell its anhydrous paroxetine, it couldn't sell product manufactured from paroxetine sold to it by Asahi even if it wanted to. It may be quite content with re-selling Paxil pursuant to its license from Glaxo rather than pushing for the FDA's approval of its own product and purchasing the bulk material from Asahi and manufacturing it into capsules for sale to the public.

In the patent phase of the present suit, Asahi seeks a declaration that patent 723 is invalid. Asahi is concerned that unless and until that patent is invalidated, no one will dare buy paroxetine from Asahi, fearing that if it does so it will be sued, just as Apotex and Pentech were sued. It is apparent, however, that Asahi is seeking an advisory opinion, which a federal court is not empowered to issue. E.g., *Golden v. Zwickler*, 394 U.S. 103, 108 (1969). It thinks, though the experience of Apotex and Pentech makes one doubt that it is correct, that the threat of being sued by Glaxo for patent infringement will deter other generic manufacturers from trying to make a paroxetine-based antidepressant, thus preventing Asahi from obtaining a market for its bulk paroxetine in the United States. But the existence of legal uncertainty is not a ground for bringing a lawsuit in a judicial system, such as the federal court sys-

tem, in which judges are not authorized to issue legal advice. Legal uncertainty is pervasive, and the responsibility for dispelling it rests in the first instance on lawyers rather than judges. A lawsuit must be predicated on the violation of a right. No right of Asahi's is being infringed by Glaxo's readiness to enforce a patent.

It would be different if Glaxo were on the verge of suing Asahi for patent infringement (whether direct or indirect). The declaratory-judgment procedure permits a prospective defendant in effect to precipitate the plaintiff's suit. (See, with reference to declaratory judgments challenging the validity of a patent, *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 855 (Fed. Cir. 1999); *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 737–38 (Fed. Cir. 1988); *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 955–56 (Fed. Cir. 1987).) But that is provided the plaintiff's suit is imminent. In contrast to the last two cases cited, Glaxo is not on the verge of suing Asahi. It has no incentive to do so. Asahi not only acknowledges having no customers for its bulk paroxetine product; it contends, remember, that prospective customers are deterred by Glaxo's threat to sue them. If so, *they* can seek declaratory relief against Glaxo, but Glaxo has no incentive to sue Asahi; and so not being under a serious, palpable, foreseeable, imminent threat of being sued, Asahi cannot obtain a judicial declaration that the patent is invalid or if valid not infringed (that is, *would not* be infringed) by sale of the amorphous product. (See, in addition to the cases cited earlier, *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 634 (Fed. Cir. 1991).) Its patent claim must therefore be dismissed for want of federal subject-matter jurisdiction, and I turn to the other claims.

The principal antitrust claim is that the settlement agreement between Glaxo and Pentech restrains trade in violation of the Sherman Act because it amounts to a division of the market between the two firms. The market allegedly divided is the market for the sale of paroxetine as an antidepressant drug. But Asahi is not in that market. It does not sell an antidepressant drug; it sells the active ingredient of such a drug to firms

that use the active ingredient as an input into the manufacture of the finished pill or capsule. The general rule is that suppliers do not have "standing" (a word that is used in this context to denote the right to sue rather than the existence of jurisdiction) to complain about a violation of the antitrust laws at the customer level. E.g., *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597–99 (7th Cir. 1995); *Southwest Suburban Board of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1379–80 (7th Cir. 1987); *SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Co.*, 48 F.3d 39, 44–46 (1st Cir. 1995); *South Dakota v. Kansas City Southern Industries, Inc.*, 880 F.2d 40, 47–49 (8th Cir. 1989); *Associated Radio Service Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1362–63 (5th Cir. 1980). A supplier of excipients to Pentech could not complain about the settlement agreement even if it was injured by it because Pentech no longer bought excipients, instead obtaining finished pills, excipients and all, for nothing from Glaxo pursuant to the settlement. If suppliers of targets of antitrust violators or other tortfeasors were allowed to sue, potential plaintiffs would be stumbling over each other and the targets themselves, though their claim to relief is primary, might find themselves unable to obtain any relief.

Might it make a difference, however, that Asahi not only is a supplier or potential supplier to a competitor of Glaxo (Pentech), but is also a competitor of one of the alleged market-dividers, namely Glaxo? If Glaxo were charged with trying to squeeze Asahi out of the paroxetine business, Asahi would be the target of the antitrust violation and could sue to redress it. *Amarel v. Connell*, 102 F.3d 1494, 1507–13 (9th Cir. 1996); *Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 294–97 (2d Cir. 1983). Who better to do so? But that is not a realistic characterization of the competitive situation. Glaxo competes with firms that sell drugs, such as (among generic manufacturers) Apotex and Pentech. Its principal competitive weapon is its patents. To the extent valid, the patents exclude competition lawfully and Glaxo has no need to worry about suppliers of bulk materials, any more than it has to worry about suppliers of bottles or labels. It has no interest in preventing Asahi from supplying Pentech—on the contrary, since

it, Glaxo, is supplying Pentech with the bulk paroxetine free of charge, it would be delighted if Pentech decided to buy its paroxetine from Asahi instead (provided of course that Pentech was able to obtain the FDA's approval to sell a paroxetine product manufactured by it). The only effect would be to increase Glaxo's net royalty.

Asahi does not contend that Glaxo is trying to dry up the supply of paroxetine to its competitors. That would be a quixotic undertaking. The bottlenecks in the U.S. pharmaceutical drug industry are patents plus the regulatory permissions required to sell pharmaceutical drugs. A firm that skirts the thicket of patents and obtains approval from the Food and Drug Administration to sell its drug will have no difficulty obtaining any materials that it needs to manufacture the drug, including the active ingredient. One reason that the manufacture and sale of pharmaceutical drugs is so profitable once the costs of research, development, and regulatory approvals are covered is that the raw materials for such drugs, often and in the case of paroxetine-based drugs, are commodity chemicals. These are facts that Asahi does not and could not deny.

But if I am wrong in my legal analysis and Asahi does have "standing" to sue Glaxo and Pentech for violation of federal antitrust law, still its antitrust claim regarding the settlement and license must be dismissed. The general policy of the law is to favor the settlement of litigation, and the policy extends to the settlement of patent infringement suits. *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1368 (Fed. Cir. 2001); *Foster v. Hallco Manufacturing Co.*, 947 F.2d 469, 477 (Fed. Cir. 1991); *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976). Only if a patent settlement is a device for circumventing antitrust law is it vulnerable to an antitrust suit. Suppose a seller obtains a patent that it knows is almost certainly invalid (that is, almost certain not to survive a judicial challenge), sues its competitors, and settles the suit by licensing them to use its patent in exchange for their agreeing not to sell the patented product for less than the price specified in the license. In such a case, the patent, the suit, and the settlement would be devices—masks—for fixing prices, in violation of antitrust law.

See 2 Herbert Hovenkamp, Mark D. Janis & Mark A. Lemley, *IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law* § 31.1c (2002).

Oddly, I cannot find a case that instantiates this principle clearly, but I am sure that it is right, notwithstanding *United States v. General Electric Co.*, 272 U.S. 476 (1926), an elderly and much-criticized decision. General Electric licensed its principal competitor, Westinghouse, to manufacture light bulbs using the GE patents. GE had 69 percent of the market, Westinghouse 16 percent, and other licensees of GE 8 percent, for a total of 93 percent. The effect of the licensing agreement was to solidify the monopoly conferred by the GE patents. The license fixed a minimum price at which Westinghouse could sell the light bulbs. The royalty rate was only 2 percent but was to rise to 10 percent if Westinghouse's share of the light-bulb market exceeded 15 percent, which, as the figures above reveal, it did by the time the case was tried. The very low starting royalty rate suggests that the right to use the GE patents was not worth a lot to Westinghouse, and the rate escalation keyed to Westinghouse's market share suggests that the parties were trying to minimize competition, which was anyway the effect of the minimum-price term in the licensing agreement. The Court upheld the arrangement but I doubt that it would do so today, at least without a further inquiry into the strength of the patents and the rationale for the licensing arrangement. If, however, there is nothing suspicious about the circumstances of a patent settlement, then to prevent a cloud from being cast over the settlement process a third party should not be permitted to haul the parties to the settlement over the hot coals of antitrust litigation. *In re Tamoxifen Citrate Antitrust Litigation*, No. MDL 1408 ILG, 2003 WL 21196817, at *5–12 (E.D.N.Y. May 15, 2003); *Boston Scientific Corp. v. Schneider (Europe) AG*, 983 F. Supp. 245, 269–71 (D. Mass. 1997); cf. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 180 (1965) (Harlan, J., concurring). Here we have Pentech, a generic manufacturer and hence no natural ally of Glaxo, sued for patent infringement; it settles—and it

promptly finds itself a defendant in an antitrust suit. Something is wrong.

What is wrong is that there is nothing suspicious about the circumstances of the settlement. Patent 723 may or may not ultimately be ruled invalid; but in the *Apotex* case I held that it was valid and while I may have been mistaken, there is no doubt that the patent *may well* be valid, so that Glaxo cannot be faulted for trying to enforce it. Whether or not Pentech infringed patent 723 or other patents held by Glaxo, including patents on anhydrous forms of the paroxetine molecule, is uncertain, but there is nothing to suggest that the claim of infringement was frivolous.

It is true that Asahi *alleges* that the defendants knew when they settled that Pentech's amorphous paroxetine product would not infringe patent 723, true that factual allegations in a complaint are *normally* assumed to be true for purposes of deciding a motion to dismiss the complaint for failure to state a claim, and true too that I ruled in the *Apotex* case that that Apotex had *not* infringed patent 723—and if Apotex's product did not infringe 723, it is unlikely that Pentech's would. But the private thoughts of a patentee, or of the alleged infringer who settles with him, about whether the patent is valid or whether it has been infringed is not the issue in an antitrust case. A firm that has received a patent from the patent office (and not by fraud, a separate issue in this case, discussed later in this opinion), and thus enjoys the presumption of validity that attaches to an issued patent, 35 U.S.C. § 282, is entitled to defend the patent's validity in court, to sue alleged infringers, and to settle with them, whatever its private doubts, unless a neutral observer would reasonably think either that the patent was almost certain to be declared invalid, or the defendants were almost certain to be found not to have infringed it, if the suit went to judgment. It is not "bad faith" (compare *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1220–22 (4th Cir. 1976)) to assert patent rights that one is not certain will be upheld in a suit for infringement pressed to judgment and to settle the suit to avoid risking the loss of the rights. No one can be *certain* that he will prevail in a patent suit.

Apt here is the principle that a suit charging sham litigation as a method of monopolization must fail unless the litigation is *objectively* baseless. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60–61 (1993); *FilmTec Corp. v. Hydranautics*, 67 F.3d 931, 936–39 (Fed. Cir. 1995). And thus "if a [patent infringement] suit is not objectively baseless, an antitrust defendant's subjective motivation is immaterial." *In re Independent Service Organizations Antitrust Litigation*, 203 F.3d 1322, 1327 (Fed. Cir. 2000), quoting *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1072 (Fed. Cir. 1998). Even a "desire to crush a competitor, standing alone, is insufficient to make out a violation of the antitrust laws." *Ocean State Physicians Health Plan v. Blue Cross & Blue Shield*, 883 F.2d 1101, 1113 (1st Cir. 1989). "If conduct is not objectively anticompetitive the fact that it was motivated by hostility to competitors ('these turkeys') is irrelevant." *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 379 (7th Cir. 1986); see Michael A. Carrier, "Unraveling the Patent-Antitrust Paradox," 150 *U. Pa. L. Rev.* 761, 793–94, 816–40 (2002); and, on the movement toward objective standards of antitrust liability in general, *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224–24 (1993); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993); *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1400–1402 (7th Cir. 1989); Patrick D. Curran, "Standard-Setting Organizations: Patents, Price Fixing, and Per Se Legality," 70 *U. Chi. L. Rev.* 983, 995 (2003); cf. *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 36 (1997). Less is alleged here.

Asahi cannot pass an objective test. Although I did rule that Apotex had not infringed patent 723, I made clear that the issue was a close one. The case is now on appeal to the Federal Circuit, which for all that anyone can know may reverse. In a patent infringement suit in Pennsylvania against Apotex, Glaxo has moved for summary judgment on its claim that Apotex's product infringes patents that Glaxo holds on anhydrous paroxetine hydrochloride, and if the motion is granted, it will

in all likelihood demonstrate that Pentech would have lost its suit with Glaxo had the suit gone to judgment.

Had Pentech litigated Glaxo's patent infringement suit to judgment and lost, it would have no right to compete until patent 723 expires in 2007 (and perhaps not until other patents held by Glaxo expire even further in the future). The settlement gave it the right to compete with Glaxo in Puerto Rico immediately. It is true that it has to pay a hefty royalty to Glaxo, but since it is obtaining the product free of charge, so that its only expenses are marketing, packaging, and distribution, it can afford to undersell Glaxo. And now, Apotex having begun to market a generic paroxetine antidepressant, Pentech is selling its generic version of Paxil (which, remember, *is* Paxil, just under another name) throughout the United States, which it couldn't have done had Glaxo's suit against Pentech not been settled under terms that permitted Pentech to sell throughout the United States as soon as Apotex entered the market. It is true that if and when Apotex is held to be an infringer and forced to leave the market, Pentech under the terms of the license must go too. But that is not a suspicious circumstance, since if Apotex is an infringer by virtue of selling an anhydrous form of paroxetine, it is likely that Pentech is as well, though it is not certain. (But certainty is not the test.) Pentech's product is amorphous and Apotex's, while also anhydrous, is crystalline. The original and now expired patent on paroxetine probably was on an amorphous form of the molecule, *SmithKline Beecham Corp. v. Apotex Corp.*, supra, 247 F. Supp. 2d at 1023, and so Pentech's product may be closer than Apotex's to being securely within the public domain. But this Glaxo fiercely contests and there is no reason to think that its infringement case against Pentech was so weak that the settlement amounts to paying Pentech to stay out of the market.

"Reverse payment" patent settlements, that is, settlements *unlike* the one between Glaxo and Pentech, in which the patentee explicitly pays the alleged infringer to stay out of the market, are criticized and sometimes invalidated on the theory that they prevent competition. *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896, 907–08 (6th Cir. 2003); Carl Shapiro,

"Antitrust Limits to Patent Settlements," 34 *RAND J. Econ.* 391, 394 (2003); Herbert Hovenkamp, Mark Janis & Mark A. Lemley, "Anticompetitive Settlement of Intellectual Property Disputes," 87 *Minn. L. Rev.* 1719, 1749–63 (2003). Whether it is a sound theory may be doubted, since if settlement negotiations fell through and the patentee went on to win his suit, competition would be prevented to the same extent. See *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, 261 F. Supp. 2d 188, 250–52 (E.D.N.Y. 2003). A ban on reverse-payment settlements would reduce the incentive to challenge patents by reducing the challenger's settlement options should he be sued for infringement, and so might well be thought anticompetitive. At any rate, the theory, good or bad, is inapplicable here. There is no doubt a sense in which Glaxo "paid" Pentech to stay out of (part of) the market: it gave it paroxetine free of charge and in exchange Pentech agreed to confine itself to Puerto Rico until Apotex began selling its generic. But *any* settlement agreement can be characterized as involving "compensation" to the defendant, who would not settle unless he had something to show for the settlement. If any settlement agreement is thus to be classified as involving a forbidden "reverse payment," we shall have no more patent settlements. In fact there is a difference between the reverse-payment case and other forms of settlement. In a reverse-payment case, the settlement leaves the competitive situation unchanged from before the defendant tried to enter the market. In this case, in contrast, the settlement led to increased competition, first in Puerto Rico and now throughout the United States. Another way to put this is that in this case there is only a "payment" to the settling defendant when competition breaks out. The "payment" of Puerto Rico to Pentech increased the competition there, and the "payment" in the form of free paroxetine occurred as a byproduct of increased competition, that is, of Pentech's selling in competition with Glaxo.

Besides challenging the settlement agreement, and the license that Glaxo granted Pentech pursuant to it, as a scheme to divide markets, Asahi claims that Glaxo's action in naming it as a defendant in the patent infringement suit against Pen-

tech was "sham litigation" in violation of the antitrust laws, and in addition that Glaxo procured its patent 723 by fraud on the patent office. Again, to avoid turning every patent case into an antitrust case, some threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase. As we noted earlier, an infringement suit must be adjudged to be objectively baseless before it can be considered an unlawful method of competition; that is, the determination of whether such a suit is a sham depends not on what the patentee believes but "on the nature of and the underlying merits of the patentee's case." *FilmTec Corp. v. Hydranautics, supra,* 67 F.3d at 936; see also *Nobelpharma AB v. Implant Innovations, Inc., supra,* 141 F.3d at 1071–73; *Carroll Touch, Inc. v. Electro Mechanical Systems, Inc.,* 15 F.3d 1573, 1582–83 (Fed. Cir. 1993). Since Glaxo had a colorable patent infringement claim against Pentech and Pentech had a contract to obtain the infringing active ingredient from Asahi, Glaxo also had a colorable claim of indirect infringement against Asahi. There was nothing sham about it. And again, because Glaxo has no interest in excluding suppliers (as distinct from competitors such as Pentech and Apotex) from the market, its naming of Asahi as a defendant in the suit against Pentech cannot be regarded as an anticompetitive measure, and so Asahi lacks antitrust standing to press it. *Southwest Suburban Board of Realtors, Inc. v. Beverly Area Planning Association, supra,* 830 F.2d at 1379–80.

The claim of fraud on the patent office fails for the reason just given: if patent 723 was obtained by fraud, it was a fraud aimed at competing manufacturers of drugs, not at the suppliers of those manufacturers, and so the fraud claim cannot be pressed as an antitrust claim. See *id.;* cf. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., supra,* 382 U.S. at 177–78. Moreover, it is apparent from my discussion of issues of patent validity in the *Apotex* case that none of the information allegedly withheld from the patent examiner—some of which did not even come into existence until after the patent was issued—was material to the patentability of Glaxo's compound. A patent examiner has no discretion to deny a pat-

ent that satisfies the criteria of patentability, 35 U.S.C. § 131; see 37 CFR § 1.104(c), and so the withholding from him of immaterial information could not, as a matter of law, affect the validity of the patent. *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1364–65 (Fed. Cir. 1998); *Nobelpharma AB v. Implant Innovations, Inc., supra*, 141 F.3d at 1070–71; cf. *Brunswick v. Riegel Textile Corp.*, 752 F.2d 261, 265–68 (7th Cir. 1984).

As a detail (because it would not be itself a basis for granting a motion to dismiss, *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 62 F.3d 967, 976–77 (7th Cir. 1995)), I note also Asahi's failure to distinguish between a patent "monopoly" and an economic monopoly. A patent confers a monopoly in the sense of a right to exclude others from selling the patented product. But if there are close substitutes for the patented product, the patent "monopoly" is not a monopoly in a sense relevant to antitrust law. *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 392–404 (1956); Hovenkamp, Janis & Lemley, *supra*, § 4.2a. Patent 723 gives Glaxo an exclusive right to sell a particular crystalline form of paroxetine. Even if no other form of the paroxetine molecule can be sold that would not infringe patent 723, paroxetine competes with the molecules (all different) that are the basis for such well-known competing antidepressant drugs as Prozac (no longer under patent) and Zoloft, to confine attention to the class of antidepressants known as SSRIs (there are other, newer types of antidepressant as well, which compete with SSRIs). As I pointed out in *Smithkline Beecham Corp. v. Apotex Corp., supra*, 247 F. Supp. 2d at 1015, there are therapeutic differences even within the category of SSRIs that may warrant treating paroxetine as a separate market, cf. *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1062–65 (3d Cir. 1978), but this cannot merely be assumed, as Asahi seems to want to do.

Asahi also alleges violations of the Illinois Antitrust Act and charges Pentech with breach of contract and promissory estoppel and Glaxo with tortious interference with a contract between Pentech and Asahi. The state antitrust charge falls for the same reasons as the federal, since there is no difference

material to this case between the state and federal statutes. See *O'Regan v. Arbitration Forums, Inc.*, 121 F.3d 1060, 1066 (7th Cir. 1997); *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 642 N.E.2d 470, 472, 474 (Ill. 1994); *Laughlin v. Evanston Hospital*, 550 N.E.2d 986, 990 (Ill. 1990); *People ex rel. Scott v. College Hills Corp.*, 435 N.E.2d 463, 469 (Ill. 1982). The promissory-estoppel claim is frivolous.

The other two claims, however, are not frivolous, and I cannot dismiss them just because I am dismissing the federal claims, as I could do if they were merely supplementary claims—the state tail on a federal dog. For the parties are of diverse citizenship and the stakes in the claims in question exceed $75,000.

The breach of contract claim arises from an agreement of Pentech to indemnify Asahi for the expenses of litigation should it be named as a defendant in a suit for patent infringement against Pentech. Pentech argues that the agreement was limited to the expenses of litigating a suit arising out of Pentech's attempt to sell its paroxetine product to treat sexual dysfunction, whereas the infringement suit was based on Pentech's intention to sell the product to treat depression. The contract is not so clear on its face that I can interpret it without recourse to extrinsic evidence. The claim of tortious interference is that Asahi had an understanding with Pentech that Pentech would buy any paroxetine it needed from Asahi, which the terms of the settlement agreement with Glaxo effectively scotched. Whether there was such an understanding sufficient to support a suit for interference with contractual or other advantageous business relations under Illinois law, on which see *Intercontinental Parts, Inc. v. Caterpillar, Inc.*, 631 N.E.2d 1258, 1269 (Ill. App. 1994), cannot be determined from the face of the complaint. (The understanding was not in writing.)

The motion to dismiss the complaint is granted in part and denied in part, as explained in this opinion.

Richard A. Posner
U.S. Circuit Judge

October 29, 2003